UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



JUAN MARQUEZ,

                         Petitioner,

        v.

GLENN S. GOORD, Commissioner New York State
Department of Correctional Services, BRIAN
FISCHER, Superintendent Sing Sing Correctional
Facility,

                         Respondents.

Case No. 05-CV-3549 (KMK)(LMS)

<u>ORDER ADOPTING REPORT
AND RECOMMENDATION</u>

KENNETH M. KARAS, District Judge:

        Petitioner Juan Marquez, proceeding pro se, brings this petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 ("the Petition").  (Dkt. No. 1.)  He challenges his conviction

following trial by the Supreme Court of New York for Manslaughter in the First Degree, in

violation of New York Penal Law section 125.20, and Criminal Possession of a Weapon in the

Third Degree, in violation of New York Penal Law section 265.02.  On March 13, 2001,

Petitioner was sentenced to 20 years in prison for his conviction of Manslaughter in the First

Degree and one and one-third to four years in prison for his conviction of Criminal Possession of

a Weapon in the Third Degree, the latter to run concurrent with the former.

        On February 13, 2002, Petitioner filed an appeal to the New York State Appellate

Division, Second Department raising five claims: (1) eye-witness identifications of Petitioner at

trial should have been suppressed because of suggestive police procedures; (2) Petitioner's

statements to police should have been suppressed because his arrest was unlawful, and he was

not advised of his *Miranda* rights; (3) the weight of the evidence did not support the verdict; (4)

Petitioner's counsel was constitutionally ineffective; and (5) the sentence was excessive.

(Respondent's Exhibits to Mem. of Law. ("Resp. Ex.") 7 at R:64.)  The New York Appellate

Division affirmed Petitioner's conviction.  *See People v. Marquez*, 754 N.Y.S. 2d 890 (App. Div.

2003).  On April 12, 2003, Petitioner filed for leave to appeal to the New York Court of Appeals,

which was denied on December 10, 2003.  (Resp. Ex. 11 at R:182; Resp. Ex. 12 at R:188.)

Petitioner filed no further appeals, nor sought any other post conviction relief in the state courts.

On March 18, 2005, Petitioner submitted this Petition to prison authorities, pressing the same

five arguments raised on direct appeal.

    The case was referred to Magistrate Judge Lisa M. Smith pursuant to 28 U.S.C.

§ 636(b).[1]  On March 9, 2010, Magistrate Judge Smith issued a Report and Recommendation

("R&R"), concluding that the Court should dismiss the Petition on the grounds that it is

untimely.  (Dkt. No. 14.)  Petitioner submitted timely objections.  (Objections to Magistrate's

R&R ("Obj.") (Dkt. No. 17).)  For the reasons set forth herein, the Court adopts the R&R and

denies Petitioner's claims for habeas relief.

<u>I. Background</u>

    The Court summarizes the factual background below as drawn from the records before

the trial court.  On June 18, 2000, between 3:00 and 4:00 a.m., Petitioner left a recording studio

in New York City and drove to Yonkers, arriving between 4:00 and 5:00 a.m.  (T1:125.)[2]  After

---

    [1] The case initially was assigned to Judge Colleen McMahon, who referred the matter to
Magistrate Judge Lisa M. Smith on April 19, 2005.  (Dkt. No. 2.)  The case was reassigned to
this Court on August 6, 2007.  (Dkt. No. 12.)

    [2] Numerical references preceded by "T1" refer to the trial transcript on January 26, 2001;
those preceded by "T2" refer to the trial transcript on January 29, 2001; those preceded by "H"
refer to the record of the *Wade/Huntley* hearing on January 22, 2001; those preceded by "H2"
refer to the record of the *Wade/Huntley* hearing on January 25, 2001; and those preceded by "S"
refer to the record of Petitioner's sentencing on March 13, 2001.

arriving in Yonkers, Petitioner met two friends, eventually drove one of the friends home, and then continued driving with Equilla Ross. (*Id.*)  Upon approaching an intersection, the Petitioner encountered the victim, Aaron Boyed, walking in the middle of the street. (*Id.* at 126.) Petitioner tried to maneuver the van around Boyed, but Boyed moved so that the van could not pass. (*Id.*)  Petitioner and Ross cursed and yelled at Boyed, who yelled and cursed back. (*Id.*) Petitioner then proceeded to manuever the van around Boyed and pulled over on the side of the street. (*Id.* at 126-27.)

As the arguing grew more intense, Anna Paz, who was sleeping on the living room couch in her apartment located at 62 Ash Street, awoke at approximately 5:15 a.m. (*Id.* at 75-78; H2: 18.)  For five to ten minutes, Paz watched the argument from her apartment window; Petitioner had parked his van directly below her window, approximately 15 feet from her position. (T1: 78, 80, 84-86; H2: 5-6, 23-24.)  Paz observed three men—two black men and a Hispanic man— arguing "back and forth" in the street approximately fifteen feet from her window, and she was able to observe their faces from different angles. (H2: 5-6, 24.)  She described Petitioner as the Hispanic man who had hair "close to his head," meaning that it was not puffy or worn in an "Afro" style, not necessarily that it was short. (*Id.* at 6, 23.)  Then Boyed, still cursing and ranting, walked away. (T1: 128-30.)  At this point, Petitioner and Ross drove away, proceeding in the same direction that Boyed had gone. (*Id.* at 102, 129-30.)  Paz, who was still watching, thought the incident was over and went back to bed. (*Id.* at 90.)  However, the incident had not ended.  Petitioner pulled over the van again near the corner of Oak Street and Elm Street, got out of the van with Ross, and the two followed as Boyed backed away from them. (*Id.* at 129, T2: 58, 61-62, 66, 95-96.)

3

At this point, a bystander, Marino Morillo, who was drinking beer and playing dice with friends outside of a mini-market, recognized Petitioner, whom he had known for several years as "Pappy." (T2: 59-62.) Morillo watched as Petitioner and Ross each threw an empty bottle at Boyed. (T1: 61-62.) Morillo then walked over to Petitioner and tried to convince him to leave Boyed alone, (T2: 62-63, 130), but Petitioner responded that Boyed was "being fresh," (*Id.* at 130).

Petitioner and Ross chased after Boyed, who tried to leave, and upon catching him, Ross grabbed Boyed by the arm and struck him with his fist. (T2: 66-67, 102, 105-06.) With Morillo watching, Petitioner stabbed Boyed twice in the torso with a folding knife. (*Id.* at 107-08, 138-39.) Boyed was stabbed once in the abdomen, and once near his left breast, where his heart was punctured. (*Id.*) Boyed staggered into the street, and Petitioner "swiped" him with the van as Petitioner drove away going the wrong way down a one-way section of Oak Street. (*Id.* at 16-17, 23, 45-47, 70-71.) A woman, Marion Mays, who had met Petitioner earlier that same morning inside the mini-mart, also witnessed the attack from her apartment window. (*Id.* at 11-15, 39.) Shortly after, at approximately 5:46 a.m., police officers and an EMT truck arrived. (T1: 31-43.) Boyed was transported to St. Joseph's Hospital, where he was pronounced dead at 6:35 a.m. (*Id.* at 22-24.)

Soon after the incident, Detective Stephen Spodnick was assigned to investigate the death of Boyed. (*Id.* at 105-06.) During the course of his investigation, Spodnick received information that Petitioner was responsible for the murder. Specifically, on June 21, 2000, Morillo told police that he had witnessed the stabbing and described the incident to police. (H: 8, 40-42.)

Detective Spoknick also showed Morillo two photo arrays. (*Id.* at 9-11, 20-21.) At the time the photo array was compiled, Morillo had provided only Petitioner's last name, which the police entered into the computer system. (*Id.* at 10-11, 118.) As a result, the computer inserted a photo of Petitioner's brother, Adam Marquez, along with five filler photos. (*Id.* at 12, 71-72.) When the photo array was shown to Morillo, he pointed to the photo of Petitioner's brother, stating that while the photo resembled the man who had stabbed Boyed, this person's lips appeared too big. (*Id.* at 15-17, 81-83, 132, 150.) Morillo further stated that he was "90 percent sure" that he had identified the perpetrator, but it would be easier if he could personally observe the individual. (*Id.* at 17-18.)

Next, Detective Spodnick returned to the computer to compile a new photo array. (*Id.* at 19, 82-85.) In doing so, the Detective discovered that Petitioner and Adam Marquez were brothers, who looked very similar in appearance. (*Id.* at 19-20.) Approximately two hours after viewing the first array, police asked Morillo to look at a new array, which did contain a picture of Petitioner Juan Marquez. (*Id.* at 21-22, 152.) Upon viewing the array, Morillo quickly pointed to Petitioner's photo and said, "That's it, the guy, 100 percent sure." (*Id.* at 21-22, 88, 136, 153.)

On June 24, 2000, Equilla Ross, the man who was with Petitioner at the time of the stabbing, informed police that he had information regarding the June 18, 2000 stabbing, and agreed to come to the police station. (*Id.* at 26-28, 91.) Ross informed Spodnick that he had witnessed the stabbing, and although he did not know Petitioner's full name, when police asked Ross to look at a photo array, he too was able to pick out Petitioner. (*Id.* at 28-29.)

Acting on the information they had received from Ross and Morillo, on the morning of June 25, 2000, Spodnick telephoned Petitioner and asked him to come down to the police station

5

to discuss a problem concerning his vehicle registration. (T1: 108.) Petitioner agreed to come to the station in the next half hour. (*Id.* at 109.) At this time, however, Spodnick and several other officers were already stationed outside Petitioner's house. (*Id.* at 108-110.) Approximately 45 minutes after Spodnick placed the call to Petitioner, he called Petitioner's house again and was told that Petitioner had already left the house. (*Id.* at 112, 145.) Spodnick waited another 45 minutes or so and then he and another detective walked to the front of the house and asked Petitioner's parents, who were outside, if their son was home and explained what had transpired over the phone. (*Id.* at 113-14.) Petitioner's parents invited the two detectives into the house, where the detectives explained the need to speak to Petitioner about the car registration problem. (*Id.* at 114-15.)

Petitioner's parents then led Detective Spodnick to Petitioner's downstairs bedroom. (*Id.*) After several knocks, Petitioner opened the door and agreed to accompany Spodnick to the police station to discuss the car registration problem. (*Id.* at 115.) Petitioner walked outside and got into an unmarked police car, but was not placed under arrest at this point. (*Id.* at 115-16, 146-47.) Nor was Petitioner frisked, patted down, or handcuffed. (*Id.*)

At the police station, Petitioner was led to the interview room. (*Id.* at 116.) Before Detective Spodnick asked any questions, he advised Petitioner of his *Miranda* rights, which Petitioner asserted he understood. Petitioner then signed and dated the *Miranda* card and stated that he would talk to the Detective. (*Id.* at 120-22.) At this point, Detective Spodnick informed Petitioner that the real reason he was there was to discuss the June 18 stabbing of Aaron Boyed, to which Petitioner responded that he had assumed that was why he was there. (*Id.* at 122-23.) After admitting almost every detail of the crime aside from the stabbing itself, Petitioner was placed under arrest. (*Id.* at 124-142.)

6

On June 27, 2000, Anna Paz informed police she had information pertaining to Boyed's stabbing and went to the station to view a photo array. (H: 31-37.) Paz was told to "look hard," because the photos may not be recent, and also was told that the police would attempt to locate more recent photos for her to view. (H2: 9.) At this time, Paz pointed to two photos, and when asked whether she was sure about her selections, Paz stated that she was not positive if either photo contained the photo of the man she had seen on June 18. (*Id.* at 9, 14, 27, 29.) Police officers stated they would attempt to find a more recent photograph for Paz to view. (*Id.* at 10, 15-16.)

Sometime later that day, police officers showed Paz a second photo array, (*id.* at 11-12, 16), which included a recent photo of Petitioner from his June 25, 2000 arrest, (H:32, 38-39, 98). Paz was asked to indicate whether she recognized the person she had seen arguing with a black man on Oak Street on June 18, 2000. (*Id.* at 37; H2: 15.) Paz quickly pointed to position "5," which contained Petitioner's arrest photo. (H: 34-36; H2: 16, 29-30.) Paz asserted that she was positive that the individual in the photo was the Hispanic man she had seen on June 18, although the individual in the photo had hair that appeared to be "brushed out." (H2: 11-12, 16, 29-32.) Paz also provided the police with her observations of what occurred in the early morning of June 18, 2000.

## II. Discussion

### A. Review of Report and Recommendation

#### 1. Standard of Review

A district court, in reviewing a report and recommendation addressing a dispositive motion, "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also Donahue v. Global Home Loans*

7

*& Fin., Inc.*, No. 05-CV-8362, 2007 WL 831816, at *1 (S.D.N.Y. Mar. 15, 2007).  Under 28

U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), parties may submit objections to

the magistrate judge's report and recommendation.  The objections must be "specific" and

"written," Fed. R. Civ. P. 72(b)(2), and must be made "[w]ithin 14 days after being served with a

copy of the recommended disposition," *id.*; *see also* 28 U.S.C. § 636(b)(1), plus an additional

three days when service is made pursuant to Federal Rule of Civil Procedure 5(b)(2)(C)-(F).

Where a party submits timely objections to a report and recommendation, as Petitioner

did here, the district court reviews de novo the parts of the report and recommendation to which

the party objected.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); *Donahue*, 2007 WL

831816, at *1.  The district court "may adopt those portions of the . . . report [and

recommendation] to which 'no specific written objection' is made, as long as the factual and

legal bases supporting the findings and conclusions set forth in those sections are not clearly

erroneous or contrary to law." *Eisenberg v. New England Motor Freight, Inc.*, 564 F. Supp. 2d

224, 226 (S.D.N.Y. 2008) (quoting Fed. R. Civ. P. 72(b)(2)).

### 2. Review of Timeliness Recommendation

The Court adopts Magistrate Judge Smith's finding that the instant Petition be dismissed

as untimely.  Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), there is a

one-year statute of limitations for a prisoner to petition for a writ of habeas corpus, which begins

on the date that the state court judgment became final through direct review or the expiration of

the time for seeking such review.  *See* 28 U.S.C. § 2244(d)(1)(A); *Smith v. McGinnis*, 208 F.3d

13, 15 (2d Cir. 2000) ("Section 2244(d) created a new one-year statute of limitations in which

state prisoners could file applications for a writ of habeas corpus.").

8

Petitioner's petition for leave to appeal to the New York Court of Appeals was denied on December 10, 2003. (R&R at 2; Resp. Ex. 13 at R:188.) The next step in direct appeal would have been for Petitioner to file a petition for a writ of certiorari to the United States Supreme Court. Supreme Court Rule 13 requires that certiorari petitions be filed within ninety days after judgment was entered in the state court of last resort. *See* Sup. Ct. R. 13. Thus, Petitioner's 90-day period for filing the writ of certiorari ended on March 9, 2004, without Petitioner making any further filing.[3] Accordingly, on March 9, 2004, the state judgment became final and the one-year AEDPA statute of limitations began to run. *See Pratt v. Greiner*, 306 F.3d 1190, 1195 n.1 (2d Cir. 2002) ("A conviction becomes final for purposes of 28 U.S.C. § 2244(d) upon expiration of the ninety-day period to petition for a writ of certiorari to the United States Supreme Court."); *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001) (noting that the "AEDPA limitations period specified in Section 2244(d)(1)(A) does not begin to run until the completion of direct appellate review in the state court system and either the completion of certiorari proceedings in the United States Supreme Court, or—if the prisoner elects not to file a petition for certiorari—the time to seek direct review via certiorari has expired").

"When a statute of limitations is measured in years, the last day for instituting the action is the anniversary date of the start of the limitations period." *Ross v. Artuz*, 150 F.3d 97, 103 (2d Cir. 1998); *see also Fernandez v. Artuz*, 402 F.3d 111, 112 (2d Cir. 2005) (explaining that petitioner's conviction became final 90 days after the New York Court of Appeals denied leave

---

[3] The Parties' submissions and the R&R state that Petitioner's 90-day time period to file a writ of certiorari ended March 10, 2004. This Court respectfully disagrees with that computation of time and clarifies now that the 90-day time period ended on March 9, 2004. However, that is of no legal consequence here.

9

to appeal, and the AEDPA one-year statute of limitations expired exactly one year later). Thus, in Petitioner's case, the statute of limitations period expired on March 9, 2005.

Petitioner filed his Petition on March 18, 2005, nine days after the statute of limitations expired. According to the "prison mailbox" rule, once a pro se petitioner hands his petition for a writ of habeas corpus to a prison employee, it is considered filed. *See* Fed. R. App. P. 25(2)(C) (codifying the prison mailbox rule)*; Houston v. Lack*, 487 U.S. 266, 276 (1988) (holding that "the notice of appeal was filed at the time petitioner delivered it to the prison authorities for forwarding to the court clerk"); *Noble v. Kelly*, 246 F.3d 93, 97-98 (2d Cir. 2001) (extending prison mailbox rule to habeas filing requirements). Petitioner supplied the date "3/18/05" in the following statement at the conclusion of the Petition: "I declare under penalty of perjury that on 3/18/05, I delivered this petition to prison authorities to be mailed to the United States District Court for the Southern District of New York." (Petition at 5.) Petitioner also supplied the date 3/18/05 on that same page in declaring that the contents of the Petition were true and correct. (*Id.*) Moreover, the petition form contains a space where an applicant can give reasons why a petition was filed after the statute of limitations ran. In this space, Petitioner wrote that he filed his petition "consistent with the provisions codified in 28 U.S.C. §2244(d) . . . which places petitioner's present request for Writ of Habeas Corpus timely filed . . . ," apparently unaware that the Petition was filed late. (*Id.* at 4.) With no evidence to the contrary, this Court considers the Petition filed on the date that Petitioner signed it—March 18, 2005. *See Jackson v. Poole,* No. 06-CV-00188, 2011 WL 4901314, at *2 n.2 (S.D.N.Y. July 19, 2011) (explaining that the petition is deemed filed on "the date when Petitioner declared under penalty of perjury that he delivered the petition to prison authorities to be mailed to the Court"), *adopted by* 2011 WL 4908740 (S.D.N.Y. Oct. 14, 2011); *see also Rosario v. Bennett*, No. 01-CV-7142, 2002 WL

10

31852827, at *12 (S.D.N.Y. Dec. 20, 2002) (same and collecting cases).  Accordingly,

Magistrate Judge Smith properly concluded that Petitioner's filing on March 18, 2005 was late.

 Petitioner objects to Magistrate Judge Smith's decision to deny his application for a writ

of habeas corpus on two grounds.  First, he asserts that the Petition is not untimely because "it is

only late by maybe 3 days."[4]  (Obj. at 2.)  But, petitions filed after the statute of limitations has

expired, even if only by a matter of days, are considered late.  *See Saunders v. Senkowski*, 587

F.3d 543, 546 (2d Cir. 2009) (affirming dismissal of petition filed four days after statute of

limitations had run); *Belot v. Burge*, 490 F.3d 201, 204 (2d Cir. 2007) (affirming decision that

pro se petition filed five days after statute of limitations had run was untimely); *Wilson v.

Bennett*, 188 F. Supp. 2d 347, 353 (S.D.N.Y. 2002) (dismissing petition filed fifteen days late as

untimely); *see also Davis v. Artuz*, No. 99-CV-9244, 2001 WL 199454, at *4 (S.D.N.Y. Feb. 28,

2001) ("Petitioner is not entitled to a more lenient standard because of his status as a pro se

litigant.").  Thus, the Court agrees with Magistrate Judge Smith that the Petition was filed after

the statute of limitations had run.

 Second, Petitioner argues that, if the Petition was untimely, "he should be excused due to

the 'extraordinary and difficult circumstances' that prevented him from filing his petition on

time." (Obj. at 2.)  Equitable tolling may be used to relieve prisoners seeking habeas corpus in

---

 [4] Petitioner includes in his Objections the statement that he received notification of the
New York Court of Appeals denial of appeal "on or about December 15, 2003," which may
explain his calculation that the Petition was late by three days.  (Obj. at 2.)  However, Supreme
Court Rule 13 specifies that the 90-day period for review begins "after entry of the judgment,"
not when the judgment is received.  *See* Sup. Ct. R. 13; *see also Saunders v. Senkowski*, 587 F.3d
543, 549 (2d Cir. 2009) (explaining that "statutory tolling for the purposes of AEDPA ends with
the 'filing' of the state court's final order, and expressly reject[ing] [the argument that review]
remained pending until [petitioner] received notice of the state court's order.").  In any event, the
question of whether the Petition was late by three days or nine days is not relevant, because the
finding that the Petition was late does not depend on the number of days at issue.

extraordinary circumstances. *See Holland v. Florida*, 130 S. Ct. 2549, 2560 (2010) (holding that one-year statute of limitations in AEDPA is subject to equitable tolling in appropriate cases); *Smith*, 208 F.3d at 17 (explaining that the statute of limitations for filing a habeas corpus petition may be tolled in "rare and exceptional circumstance[s]" (internal quotation marks omitted)). "[A] litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way" of timely filing the petition. *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). As to the second element, a petitioner "must demonstrate a causal relationship between the extraordinary circumstances . . . and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstance." *Hizbullahankhamon v. Walker*, 255 F.3d 65, 75 (2d Cir. 2001) (quoting *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000)).

In his Objections, Petitioner offers two reasons to equitably toll the statute of limitations: (1) that he diligently sought assistance from the prison library clerks, because as a pro se litigant he "had to depend on [their] total assistance and knowledge," but that the library clerk helping him was transferred to another prison and took Petitioner's legal papers; and (2) that he received limited access to the law library because the person in charge of access accepted bribes from certain inmates in exchange for more time in the library. (Obj. at 2.) As explained below, neither of these excuses constitutes extraordinary circumstances for equitable tolling purposes.

To begin, Petitioner's claim regarding his access to the library clerks allegedly required by his pro se status and the loss of his legal papers fails. A petitioner's pro se status by itself does not entitle a habeas petitioner to equitable tolling. *See Smith*, 208 F.3d at 18 (finding that pro se status did not merit equitable tolling); *Mercado v. Lempke*, No. 07-CV-9865, 2009 WL

12

2482127, at *10 n.8 (S.D.N.Y. Aug. 13, 2009) ("The Second Circuit has already decided . . . that a petitioner's status as a pro se lay person does not warrant equitable tolling."); *accord Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 172 n.7 (S.D.N.Y. 2000) ("[C]laims that petitioner did not have professional legal assistance [and] did not know what to do . . . are far from the extraordinary circumstances required to toll the statute." (internal quotation marks omitted)).

Nor is the unavailability of a library clerk familiar with Petitioner's case an extraordinary circumstance. *See King v. Lee,* No. 11-CV-0213, 2012 WL 1038562, at *5 (W.D.N.Y. Mar. 27, 2012) ("The lack of an attorney or an inmate law clerk to assist [petitioner] in preparing his petition is not a basis for equitable tolling because there is no absolute right to counsel or other legal assistance in connection with a habeas corpus petition."); *Torres v. Ercole*, No. 06-CV-4058, 2009 WL 2337997, at *2 (S.D.N.Y. July 29, 2009) (holding that petitioner's assertions that the law library clerk assisting him was paroled and petitioner lacked knowledge of the law "do not provide a sufficient basis for equitable tolling"); *Jackson v. Kelly*, No. 98-CV-3454, 2000 WL 325690, at *3 (S.D.N.Y. Mar. 28, 2000) (finding that inadequate assistance from inmate law clerk insufficient for equitable tolling); *see also Davis v. McCoy*, No. 00-CV-1681, 2000 WL 973752, at *2 (S.D.N.Y. July 14, 2000) (finding that petitioner's equitable tolling argument based on the inability to obtain documents for two years fails and explaining that the "routine restrictions of prison life" do not meet the extraordinary circumstances standard (internal quotation marks omitted)).

It is true that "[t]he intentional confiscation of a prisoner's habeas corpus petition and legal papers by a corrections officer is 'extraordinary' as a matter of law," *Valverde*, 224 F.3d at 133, but this axiom does not apply to situations like this one, which involve a petitioner forfeiting control over his own legal papers to another inmate. This is hardly an exceptional

13

circumstance that justifies equitably tolling the statute of limitations. *See Pillco v. Bradt*, No. 10-CV-2393, 2010 WL 3398467, at *2 (S.D.N.Y. Aug. 26, 2010) (rejecting equitable tolling argument based on claim that inmate-clerk who was assisting petitioner took petitioner's papers when transferred, because "entrusting one's legal papers to another inmate cannot be a ground for equitable tolling as it represents a complete abdication of responsibility by the habeas petitioner"); *see also Prescod v. Brown*, No. 10-CV-2395, 2011 WL 182063, at *5 (S.D.N.Y. Jan. 20, 2011) (collecting cases), *adopted by* 2011 WL 497855 (S.D.N.Y. Feb. 10, 2011). Moreover, unless Petitioner can establish that any prison official did anything to intentionally deny Petitioner his legal papers, courts regularly reject equitable tolling claims based on lost legal papers. *See Paul v. Conway*, No. 04-CV-9493, 2005 WL 914384, at *6 (S.D.N.Y. Apr. 19, 2005) (ruling that negligent loss of legal papers does not entitle petitioner to equitable tolling); *Cox v. Edwards*, No. 02-CV-7067, 2003 WL 22221059, at *3 (S.D.N.Y. Sept. 26, 2003) (finding no equitable tolling where petitioner alleged that his legal papers were lost by either other inmates or correctional facility personnel).

Even if the loss of his legal papers were an extraordinary circumstance, Petitioner does not establish the necessary causal link between that event and his failure to file the Petition on time; indeed, Petitioner provides no explanation at all on this point. The absence of such an explanation is fatal to Petitioner's claim. *See Nash v. McGinnis*, No. 04-CV-9496, 2005 WL 1719871, at *4 (S.D.N.Y. July 22, 2005) ("Petitioner makes no specific allegations explaining how the [loss of legal documentation] prevented him from filing his habeas petition in a timely manner," which "alone fatally undermines Petitioner's claim for equitable tolling."); *Paul*, 2005 WL 914384, at *6 ("[Petitioner] does not explain how the loss of his papers prevented him from sending our Court a timely habeas petition on the simple form."); *Mateos v. West*, 357 F. Supp.

14

2d 572, 577 (E.D.N.Y. 2005) ("[P]etitioner does not state when the alleged confiscation occurred.  Moreover, the petitioner fails to meet his burden to demonstrate that he acted with reasonable diligence to file his habeas petition following the confiscation of his legal papers.").

Here, moreover, the fact that the Petition sets forth identical grounds for relief as those presented in the direct appeal further undermines any argument that the lost legal papers were the cause of Petitioner's untimely filing.  *See Nash*, 2005 WL 1719871, at *4 ("On [the causation] point, it is highly relevant that at least some of Petitioner's claims for relief mimic those made either in his direct appeal or in the appeal of the denial of his § 440.10 motion."); *Quezada v. Artuz*, No. 98-CV-2593, 2001 WL 1262402, at *2 (E.D.N.Y. Oct. 17, 2001) ("Further, plaintiff does not indicate how the lost legal papers were necessary in the preparation of his petition.  In fact, the petition required virtually no preparation because it merely raises the same claims presented on direct appeal and does so merely by citing petitioner's Appellate Division briefs."); *see also Giles v. Smith*, No. 10-CV-5322, 2010 WL 4159468, at *4 (S.D.N.Y. Oct. 8, 2010) ("[W]here documents are not necessary to develop the legal claims, an inability to obtain such documents cannot be the basis for equitable tolling.").  Thus, Petitioner's claim that he was proceeding pro se and that he relied on a library clerk who took his legal papers upon transfer to a different facility are insufficient to justify equitable tolling in this case.

Petitioner's second objection regarding library access is similarly unpersuasive, as courts in the Second Circuit repeatedly have held that restricted access to the law library does not qualify as an extraordinary circumstance.  *See Amante v. Walker*, 268 F. Supp. 2d 154, 158 (E.D.N.Y. 2003) ("Generally, transfers between prison facilities, solitary confinement, lockdowns, restricted access to the law library, and an inability to secure court documents do not by themselves qualify as extraordinary circumstances."); *Bonilla v. Ricks*, No. 00-CV-7925,

15

2001 WL 253605, at *2 (S.D.N.Y. Mar. 14, 2001) ("[Petitioner's] argument is similar to that of

petitioners who sought more time because of their lack of legal knowledge or delays in the

prison law library, all of which have been rejected by the courts in this Circuit."); *Davis*, 2001

WL 199454, at *3 ("[P]etitioner claims to have had limited access to the law library and other

judicial resources.  Such conclusory assertions are not sufficient to trigger equitable tolling");

*Stokes v. Miller*, 216 F. Supp. 2d 169, 172 (S.D.N.Y. 2000) (finding petitioner's claim that entry

to the law library was a "nightmare" to be insufficient); *Rhodes*, 82 F. Supp. 2d at 170 n.7 (same

and collecting cases).

   Additionally, as with Petitioner's first objection, even if his claim of limited library

access constituted an extraordinary circumstance, Petitioner has not provided any explanation as

to why the limited access actually prevented a timely filing.  *See Hizbullahankhamon*, 255 F.3d

at 76 ("[E]ven assuming that the alleged deprivation of access to his legal materials and the law

library constituted an 'extraordinary circumstance' warranting equitable tolling, petitioner

cannot show that this extraordinary circumstance *prevented* him from filing a timely habeas

petition." (emphasis in original)); *see also Clay v. Artus*, No. 08-CV-1633, 2008 WL 2537141, at

*2 (E.D.N.Y. June 24, 2008) ("Petitioner's vague allegation of problems getting to the law

library does not support a claim that he was prevented from filing the habeas petition in a timely

manner.").

   Nor has Petitioner established that, acting with reasonable diligence, he was unable to file

the Petition at any point during the year.  *See Williams v. Ercole*, 486 F. App'x 208, 210 (2d Cir.

2012) (summ. order) ("We conclude that [petitioner] was not entitled to equitable tolling because

he did not carry his burden of demonstrating reasonable diligence during the period he lacked

access to the library.  [Petitioner] averred that he inquired as to the status of his library request

on two occasions, but, as the government notes, he provided no evidence or allegation that he actually told prison officials of his impending deadline."); *Hizbullahankhamon*, 255 F.3d at 76 (declining to equitably toll statute of limitations where petitioner had been in solitary confinement during part of the year time period for failing to prove that he exercised reasonable diligence to file during the remainder of the year). Furthermore, because Petitioner's initial Petition was untimely, there is no "good cause" for staying and abeying the Petition under *Rhines v. Weber*, 544 U.S. 269 (2005). *See Kidkarndee v. Graham*, No. 09-CV-5177, 2010 WL 3466574, at *2 (S.D.N.Y. Aug. 27, 2010) ("[B]ecause [an] unexhausted claim is untimely, it is meritless and cannot serve as the basis for holding the petition in abeyance under *Rhines*."); *Williams v. Conway*, 596 F. Supp. 2d 770, 777 (W.D.N.Y. 2009) (dismissing as moot petitioner's motion for a stay where the initial petition was untimely). Thus, Petitioner has failed to demonstrate extraordinary circumstances that prevented him from filing the Petition on time, and his Petition is dismissed as untimely.

### B. Analysis of Petitioner's Substantive Claims

Even if the Petition was timely, Petitioner's substantive claims fail on the merits. In order for a court to grant habeas relief, a petitioner must demonstrate both the constitutional merit of the claim *and* that the state court's rejection of the claim "resulted in a decision that was contrary to, or involved the unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Habeas corpus relief also is available if the state court's decisionmaking "resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Petitioner makes five claims: (1) eye-witness identifications of Petitioner at trial should have been suppressed because of suggestive police

procedures; (2) Petitioner's statements to police should have been suppressed because his arrest

was unlawful and he was not advised of his *Miranda* rights; (3) the weight of the evidence did

not support the verdict, (4) Petitioner's trial counsel was ineffective; and (5) the sentence was

excessive.  The Court will address each claim in turn.

### 1. Suggestive Identification Procedure (Due Process)

Petitioner first claims that his due process rights were violated when the trial court failed

to suppress the in-court testimony of both Morillo and Paz, because their identifications of

Petitioner were the result of suggestive photo identification procedures.  (Pet. Mem. at 4-8.)  The

Supreme Court has held that after considering a conviction "on its own facts," a court may set

aside the conviction, "only if the photographic identification procedure was so impermissibly

suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

*Simmons v. United States*, 390 U.S. 377, 384 (1968); *see also Foster v. California*, 394 U.S. 440,

447-48 (1969) ("[J]udged by the totality of the circumstances, the conduct of identification

procedures may be so unnecessarily suggestive and conducive to irreparable mistaken

identification as to be a denial of due process of law." (internal quotation marks omitted));

*accord Richardson v. Superintendent of Mid-Orange Corr. Facility*, 621 F.3d 196, 202 (2d Cir.

2010) (explaining that the *Foster* standard "is a fairly permissive standard" (internal quotation

marks omitted)).  The "totality of the circumstances" approach requires courts to consider

whether an eyewitness identification is reliable, notwithstanding the use of a suggestive

procedure.  *See Manson v. Brathwaite*, 432 U.S. 98, 110 (1977) ("[The totality of the

circumstances approach] permits the admission of the confrontation evidence if, despite the

suggestive aspect, the out-of-court identification possesses certain features of reliability.");

*Richardson*, 621 F.3d at 202 ("Unnecessary suggestiveness alone, however, does not require the

18

exclusion of identification testimony."). Factors affecting the reliability of an identification include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation [and] the time between the crime and the confrontation." *Manson*, 432 U.S. at 114; *see also Brisco v. Ercole*, 565 F.3d 80, 89 (2d Cir. 2009) (explaining "that courts generally look to [the] five established factors" listed above).

In *Simmons*, "the Supreme Court considered the question of impermissible suggestiveness in successive pretrial photo arrays in the context of a conviction based on subsequent witness identification at trial." *Dunlap v. Burge*, 583 F.3d 160, 165 (2d Cir. 2009). The *Simmons* Court held that there was "little chance that the procedure utilized led to misidentification of [defendant]" where the eyewitnesses were shown the photographs "while their memories were still fresh," the arrays "consisted primarily of group photographs," "[e]ach witness was alone when he or she saw the photographs," "[t]here was no evidence to indicate that the witnesses were told anything about the progress of the investigation," and "[law enforcement personnel did not,] in any other way, suggest[] which persons in the photographs were under suspicion." *Simmons*, 390 U.S. at 385. More recently, a number of federal courts have found that showing an eyewitness successive photo arrays, where each photo array contains a picture of the defendant, is not impermissibly suggestive especially when the totality of the circumstances otherwise suggests that the identification is reliable. *See Stewart v. Duckworth*, 93 F.3d 262, 265 (7th Cir. 1996) (finding no undue suggestion in showing two photo arrays, each of which contained a picture of petitioner, where the two pictures looked different); *United States v. Dowling*, 855 F.2d 114, 118 (3d Cir. 1988) (weighing "the slight, and likely inadvertent, suggestiveness of the repeated use of different photographs of [defendant] in succeeding photo

arrays" against other indicators of reliability including the eyewitness' opportunity to view the crime); *Diggs v. Spitzer*, No. 06-CV-584, 2007 WL 3036862, at *7-8 (W.D.N.Y. Oct. 16, 2007) (finding that photo arrays were not impermissibly suggestive even where defendant's photo inadvertently appeared in two successive photo arrays).

Here, the state trial court found that the photo array procedures used for Morillo and Paz's eyewitness identifications were not impermissibly suggestive.[5]  With respect to Morillo, the trial court found that he initially was shown a photo array containing a picture of Petitioner's *brother* following his statement that the surname of the individual he saw was Marquez. (Resp. Ex. 5, R:41-42.) Morillo identified the photo of Petitioner's brother in this first photo array, but stated that he was only 90% certain, because the lips were too big. (*Id.* at 42.) Morillo then was shown a second photo array containing a photo of Petitioner, whom Morillo identified with 100% certainty. (*Id.*) With respect to Paz, the trial court credited Paz's testimony that she initially was shown a photo array containing an old picture of Petitioner, and she was unable to decide between the picture of Petitioner or another picture. (*Id.* at 45-47.) She then was shown a second photo array containing a more recent picture of Petitioner, which she identified as the man she witnessed arguing outside her window. (*Id.* at 47.)[6]  Because the photo arrays did not single out the Petitioner, and in each case, the second array was created outside the presence of the eyewitness, the trial court found that the procedures were not impermissibly suggestive. (*Id.*

---

[5]  The Court focuses on the eyewitness identifications made by Paz and Morillo, because they were the subject of the *Wade* hearing referenced in Petitioner's Memorandum. At no point does Petitioner indicate that he is challenging any of the other eyewitness identifications. (Pet. Mem. at 4-8.)

[6]  Petitioner does not appear to object to the trial court's factual findings regarding the photo array procedures used in the case. (Pet. Mem. at 4-8.)

at 48.) The trial court also noted Paz's opportunity to see all angles of the perpetrator's face in the early morning light. (*Id.*) The appellate division affirmed the finding. *See Marquez*, 754 N.Y.S. 2d at 891.

In light of the case law previously cited, the Court finds that the state court's application of the law was not unreasonable. *See Richardson*, 621 F.3d at 202 (explaining that totality of the circumstances is a "fairly permissive standard, and [a] court applying this standard to the facts of a specific case is . . . entitled to significant leeway when we review its decision for reasonableness" (internal quotation marks omitted)); *Dunlap*, 583 F.3d at 165 ("It is not sufficient for a habeas petitioner to convince the district court that the state court applied a federal legal standard incorrectly; instead the petitioner must demonstrate that the legal standard was applied in a way that was objectively unreasonable."). As in *Simmons*, both eyewitnesses were shown the photo arrays while their memories were still fresh, and there was no suggestion from law enforcement to single out a particular photo.

Nor does the fact that law enforcement provided successive photo arrays require a different outcome. *See Dowling*, 855 F.2d at 118; *Stewart*, 93 F.3d at 265; *Diggs*, 2007 WL 3036862. With respect to Paz's identification, the two photo arrays contained different photos of Petitioner, the first of which was outdated. *See Stewart*, 93 F.3d at 265 (holding that photo array was not unduly suggestive where "[defendant's] photograph in the first group looks very different from his photograph in the second"); *see also Gregory-Bey v. Hanks*, 332 F.3d 1036, 1046 (7th Cir. 2003) (finding that successive photo arrays procedure where each array contained a photo of defendant was not unduly suggestive where photos were "markedly unique and different from each other"). And, with respect to Morillo's identification, the first photo array

21

contained a picture of Petitioner's brother, not Petitioner, further limiting any suggestiveness from the procedure.

Finally, the totality of the circumstances indicates that both identifications were reliable. Paz had five to ten minutes to view the perpetrator's face, (Resp. Ex. 5 at R: 48), which routinely is held be sufficient for a reliable identification. *See, e.g., Simmons,* 390 U.S. at 379 (holding that five minutes is sufficient); *Mysholowsky v. New York,* 535 F.2d 194, 195 (2d Cir. 1976) (holding that 45 seconds is sufficient). And although the trial court made no specific findings about Morillo's identification, several facts in the record indicate reliability. Morillo had known Petitioner for several years prior to witnessing the stabbing, had ample opportunity to observe Petitioner at the time of the crime, interacted with him shortly before the stabbing, and witnessed the stabbing from 20-25 meters away. (T2: 62-67, 130.) While observing the crime, Morillo told his friends that "Pappy," the name he used for Petitioner, was "cutting" the victim, indicating his certainty that he knew the person who had committed the attack. (*Id.* at 66).

Because both Paz's and Morillo's eyewitness identifications were not based on impermissibly suggestive photo arrays and contained sufficient indicia of reliability, the state court's decision not to exclude their eyewitness testimony at Petitioner's trial was not unreasonable, and Petitioner's first claim fails on the merits.

2. Suppression of Petitioner's Statements to Police

Petitioner argues that his statements to police should have been suppressed, because his arrest was unlawful, and he was not advised of his rights. Liberally construing Petitioner's Memorandum of Law, the Court will address this claim as it relates to both the Fourth and Fifth Amendments.

a. Fourth Amendment Claim

With respect to Petitioner's claim of unlawful arrest, "[w]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). The only exceptions occur "(a) if the State has provided no corrective procedures at all to redress the alleged Fourth Amendment violations; or (b) if the State has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992).

In this case, Petitioner had a full and fair opportunity to litigate his Fourth Amendment claim in a state corrective procedure. New York Criminal Procedure Law § 710.20 provides that a defendant may make a motion to suppress evidence, and "federal courts have approved [this] procedure for litigating Fourth Amendment claims . . . as being facially adequate." *Capellan*, 975 F.2d at 70 n.1 (internal quotation marks and citation omitted); *see also Montero v. Sabourin*, No. 02-CV-8666, 2003 WL 21012072, at *5 (S.D.N.Y. May 5, 2003) ("It has long been acknowledged that New York provides adequate procedures . . . for litigating Fourth Amendment claims."). Moreover, Petitioner made all relevant arguments on appeal to the Second Department, (Resp. Ex. 7 at R:64), thus availing himself of the state's corrective appellate procedure. *See Daniel v. Conway*, 498 F. Supp. 2d 673, 680 (S.D.N.Y. 2007) (noting that there was no unconscionable breakdown in corrective procedures where petitioner "availed himself of those very procedures by appealing his conviction [based upon an allegedly illegal seizure] to the Appellate Division and the state Court of Appeals").

23

Petitioner then is left with only the "unconscionable breakdown" exception, which contemplates a "disruption or obstruction of a state proceeding." *Capellan*, 975 F.2d at 70; *Vega v. Artuz*, No. 97-CV-3775, 2002 WL 252764, at *12 (S.D.N.Y. Feb. 20, 2002) (stating that "some sort of 'disruption or obstruction of a state proceeding' is typical of such a [breakdown]" (internal citations omitted)); *Papile v. Hernandez*, 697 F. Supp. 626, 633 (E.D.N.Y. 1988) ("An unconscionable breakdown of a procedure is proven where petitioner demonstrates that no state court conducted a reasoned method of inquiry into relevant questions of fact and law or [conducted] any inquiry at all into the Fourth Amendment claim." (internal quotations and alterations omitted)); *cf. Cappiello v. Hoke*, 698 F. Supp. 1042, 1050 (E.D.N.Y. 1988) (describing examples of an "unconscionable breakdown of the state's process" as including "the bribing of a trial judge, the government's knowing use of perjured testimony, or the use of torture to extract a guilty plea, all without opportunity to obtain state review"). Because the focus of the "unconscionable breakdown" inquiry is on the corrective procedures themselves, not the outcome, "a petitioner cannot gain federal review of a fourth amendment claim simply because the federal court may have reached a different result." *Capellan*, 975 F.2d at 71.

Petitioner clearly disagrees with the outcome of the state process, but he makes no arguments that the procedure itself was disrupted or obstructed such that an "unconscionable breakdown" occurred.[7] Indeed, in a separate hearing held over the course of two days, the trial

---

[7] To the extent that Petitioner argues that an unconscionable breakdown occurred due to his counsel's failures, ineffective assistance of counsel does not constitute an unconscionable breakdown in this context. *See Garcia v. Bradt*, No. 09-CV-7941, 2012 WL 2426773, at *12 (S.D.N.Y. Jan. 24, 2012) (rejecting ineffective assistance of counsel argument as insufficient to show an unconscionable breakdown), *adopted by* 2012 WL 3027780 (S.D.N.Y. July 23, 2012); *Shaw v. Scully*, 654 F. Supp. 859, 865 (S.D.N.Y. 1987) (noting that "the Court may not sidestep *Stone v. Powell* by equating ineffective assistance of counsel with unconscionable breakdown"). In any event, as discussed below, Petitioner has not demonstrated ineffective assistance of

court took testimony and heard arguments from both Petitioner's counsel and the prosecutor on the specific issue of Petitioner's Fourth Amendment rights, reserved decision, (H: 158-168), and then issued a written opinion based on specific factual findings, (Resp. Ex. 5 at R:40). Thus, there is no evidence of any disruption or obstruction of this process, and the Court finds that there was no unconscionable breakdown in the state procedure. Therefore, Petitioner's Fourth Amendment claim is not cognizable on habeas review.

### b. Fifth Amendment Claim

Petitioner also asserts that his Fifth Amendment rights were violated when police "coax[ed]" incriminating statements out of him and failed to provide a *Miranda* warning. (Pet. Mem. at 8, 11-14.) Unlike Petitioner's Fourth Amendment claim, there is no bar to federal review of a Fifth Amendment claim based on an opportunity to litigate that claim in state court. *See Withrow v. Williams*, 507 U.S. 680, 686-97 (1993) (explaining why *Stone v. Powell* does not apply to Fifth Amendment claims). "A suspect is entitled to *Miranda* warnings only if he or she is interrogated while in custody." *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998) (internal quotation marks omitted). To review an "in custody" determination for *Miranda* purposes, a court should consider: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted). A state court's factual findings on the first question regarding the circumstances of the interrogation are entitled to deference, but a reviewing court should

---

counsel.

conduct an independent review on the second question of whether a reasonable person would have felt free to leave. *Id.*

The Court first considers the circumstances surrounding the interrogation. The trial court found that before June 25, 2000, two witnesses, Ross and Morillo, provided information to the police indicating that Petitioner had stabbed Boyed. (Resp. Ex. 6 at R: 40-43.) On June 22 or 23, the police phoned Petitioner and asked him to come to the detective division "to discuss a problem with his registration"; Petitioner responded that he would try to come within a couple of days. (*Id.* at 43.) On June 25, police officers conducted surveillance of Petitioner's home and telephoned him requesting again to speak with him about a vehicle registration issue. (*Id.*) After several more phone calls, police officers approached Petitioner's home around noon and spoke to his parents, who were outside. (*Id.* at 44.) The police officers told Petitioner's parents that they needed to speak with Petitioner regarding his license plates, and Petitioner's parents brought the police to Petitioner's bedroom. (*Id.*) Petitioner "opened the door, half asleep," and the police officers explained that "[t]hey wanted to straighten the matter out about his registration." (*Id.*) Petitioner got dressed and agreed to go to the police department. "No guns were drawn. [Petitioner] was not cuffed. He was not frisked or patted down. No force was used. [Petitioner] agreed to go to the police department." (*Id.*) After arriving in the interview room, Petitioner was offered something to drink and then advised of his *Miranda* rights, which he waived. (*Id.*) Petitioner then engaged in a "cordial" conversation lasting approximately five hours wherein Petitioner made the statements at issue. (*Id.* at 45.)

Petitioner does not contest the question the accuracy of these findings, and after reviewing the record, nor does the Court. Here, the incriminating statements were not made until *after* Petitioner had been advised of his *Miranda* rights, thus neutering any claim that

26

Petitioner's *Miranda* rights were violated.  *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966)

("*Prior* to any questioning, the person must be warned that he has a right to remain silent, that

any statement he does make may be used as evidence against him, and that he has a right to the

presence of an attorney, either retained or appointed." (emphasis added)); *In re Terrorist*

*Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 202 (2d Cir. 2008) (explaining that

"courts suppress *un-warned* statements, even those that may otherwise be voluntary and

trustworthy, in order to deter future misconduct by law enforcement agents" (emphasis added)).

Based on these facts, there was no violation of Petitioner's Fifth Amendment rights, and habeas

relief is not warranted for Petitioner's second claim.

### 3. Verdict Against the Weight of the Evidence

Petitioner's third claim is that "the verdict is against the weight of the evidence."  (Pet.

Mem. at 14.)  He also claims that the verdict was based on "legally insufficient evidence." (*Id.* at

15).

### a. Verdict Against the Weight of the Evidence

The claim that a verdict is against the weight of the evidence arises from New York

Criminal Procedure Law § 470.15(5), which allows New York appellate courts to make weight

of the evidence determinations in reversing or modifying a verdict.  *See* N.Y.C.P.L. § 470.15(5);

*Garrett v. Perlman*, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) ("A 'weight of the evidence'

argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5),

which empowers New York State intermediate appellate court[s] to make weight of the evidence

determinations.").  Thus, Petitioner's weight of the evidence argument fails to allege a federal

claim as required by 28 U.S.C. § 2254(a).  *See Garrett*, 438 F. Supp. 2d at 470 ("In making a

'weight of the evidence' argument, Petitioner has not asserted a federal claim as required by 28

27

U.S.C. § 2254(a)."); *Gutierrez v. Ricks*, No. 02-CV-3780, 2002 WL 31360417, at \*6 (S.D.N.Y.

Oct. 21, 2002) (explaining that "[i]t is well-settled that a weight of the evidence claim is not

cognizable on a federal habeas review" and collecting cases); *see also* 28 U.S.C. § 2254(a)

(permitting federal habeas corpus review only where the petitioner has alleged that he is in state

custody in violation of "the Constitution or a federal law or treaty."); *Estelle v. McGuire*, 502

U.S. 62, 67-68 (1991) ("[W]e reemphasize that it is not the province of a federal habeas court to

reexamine state-court determinations on state-law questions."). Therefore, Petitioner's weight of

the evidence claim is not cognizable on habeas relief, because it is a state law claim.

### b. Legally Insufficient Evidence

Petitioner further submits that his "conviction is based on legally insufficient evidence."

(Pet. Mem. at 15.) "[I]n a challenge to a state criminal conviction brought under 28 U.S.C.

§ 2254—*if the settled procedural prerequisites for such a claim have otherwise been

satisfied*—the applicant is entitled to habeas corpus relief if it is found that upon the record

evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a

reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (emphasis added). But, here,

Petitioner did not satisfy the procedural prerequisites for this claim in his state appeal, thus

preventing this Court from considering the merits of this claim for habeas relief.

"The [independent and adequate state ground] doctrine applies to bar federal habeas

when a state court declined to address a prisoner's federal claims because the prisoner had failed

to meet a state procedural requirement." *Coleman v. Thompson,* 501 U.S. 722, 729-30 (1991);

*see also Rodriguez v. Schriver*, 392 F.3d 505, 510 (2d Cir. 2004) (declining to review a habeas

claim on the merits where state court had held that the claim was procedurally barred for failure

to object contemporaneously). In this case, the Appellate Division rejected Petitioner's

28

insufficient evidence claim, because he failed to comply with New York Criminal Procedure Law § 470.05(2), which requires an objection during trial to preserve an issue for appeal. *See Marquez,* 754 N.Y.S. 2d at 891 ("[T]he defendant's contention that the evidence was legally insufficient is unpreserved for appellate review." (citing C.P.L § 470.05(2))). New York Criminal Procedure Law § 470.05(2) requires that a trial motion to dismiss for insufficiency of the evidence be "specifically directed" and include the alleged basis for the motion in order to preserve that issue for appellate review. *See People v. Cona,* 399 N.E.2d 1167, 1169 n.2 (N.Y. 1979); *see also People v. Hawkins,* 900 N.E.2d 946, 950 (N.Y. 2008) ("To preserve for . . . review a challenge to the legal sufficiency of a conviction, a defendant must move for a trial order of dismissal, and the argument must be 'specifically directed' at the error being urged."); *People v. Gray,* 652 N.E.2d 919, 921 (N.Y. 1995) ("[E]ven where a motion to dismiss for insufficient evidence [is] made, the preservation requirement compels that the argument be 'specifically directed' at the alleged error . . . ."). Petitioner does not argue, as he cannot, that such an objection was made; indeed, Petitioner's counsel stated only the following at the end of the People's case: "I would submit that the People have failed to meet their burden of proof in this case at this time." (T2: 163.) This general statement falls far short of the specifically directed objection required by New York law to preserve the issue for appellate review. *See Gray,* 652 N.E.2d at 921. Accordingly, because Petitioner's insufficiency claim was properly rejected by the Appellate Division on the grounds that it was not properly preserved for review, the claim is procedurally barred from federal habeas review. *See Wright v. Duncan,* No. 11-CV-1463, 2012 WL 4856398, at *2 (2d Cir. Oct. 15, 2012) ("conclud[ing] that the Appellate Division's finding of procedural default [for failure to contemporaneously object] was an adequate and independent basis for the challenged state judgment"); *Whitley v. Ercole,* 642 F.3d

278, 286 (2d Cir. 2011) (holding that procedural default for failure to properly object at trial was an adequate and independent state law ground thus barring habeas review).

In certain instances, a procedurally defaulted claim may be reviewed notwithstanding the procedural bar if a petitioner demonstrates both cause for the procedural default and prejudice as a result. *See Murray v. Carrier*, 477 U.S. 478, 485-88 (1986); *Gutierrez v. Smith*, 702 F.3d 103, 111-12 (2d Cir. 2012) (explaining the cause and prejudice exception to the bar on habeas review of procedurally defaulted claims). In order to show cause, "so long as a defendant is represented by counsel whose performance is not constitutionally ineffective . . . [a petitioner must] show that some objective factor external to the defense impeded counsel's efforts to comply with the [s]tate's procedural rule." *Murray*, 477 U.S. at 488. As later discussed, although Petitioner raises a claim of ineffective assistance of counsel, that claim is without merit. He does not argue that any external factor impeded his trial counsel's ability to comply with the contemporaneous objection rule, and this Court is not aware of any such external factors from its review of the Record. Nor has Petitioner met his burden of demonstrating prejudice, which requires him to "shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 153 (1982) (emphasis in original). Petitioner has not set forth any explanation of actual prejudice, and the Court does not find otherwise.

Under a separate exception, in an "extraordinary case," a court may review a procedurally defaulted habeas claim in order to avoid a "fundamental miscarriage of justice." *Schlup v. Delo*, 513 U.S. 298, 321 (1995) (noting that this exception is "explicitly tied" to the petitioner's innocence); *Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir. 2004) (explaining that in

"extremely rare" cases, "a petitioner may use his claim of actual innocence as a 'gateway' or a means of excusing his procedural default, that enables him to obtain review of his constitutional challenges to his conviction"). In order to warrant this exception, a petitioner must demonstrate that a constitutional violation has "probably resulted in the conviction of one who is actually innocent." *Schlup*, 513 U.S. at 321; *see also Murden v. Artuz*, 497 F.3d 178, 194 (2d Cir. 2007) (explaining that this exception requires "not legal innocence but factual innocence" (internal quotation marks omitted)).

Petitioner has not made such a showing. Indeed, this is unsurprising given that two eyewitnesses testified that they witnessed Petitioner stab the victim, a third eyewitness observed Petitioner in a verbal altercation with the victim, and Petitioner admitted that he was at the scene of the crime, argued with the victim, threw bottles at the victim, and hit the victim with his van. Thus, Petitioner has not presented the "extraordinary case" allowing him to bypass the procedural bar on this claim. Therefore, Petitioner's third claim, that there was insufficient evidence supporting the guilty verdict, fails because it is procedurally barred having been denied by the state court on an independent and adequate state ground.

Even if this claim were not procedurally barred, it would fail on the merits. In reviewing the sufficiency of the evidence, this Court "ask[s] itself not whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt" but "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19 (emphasis in original). Given the aforementioned testimony of several eyewitnesses and Petitioner's own admission that he was present at the scene of the crime, the Court easily deems

it possible that construing the facts in the light most favorable to the prosecution, a rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.

### 4. Ineffective Assistance of Counsel

Petitioner claims that he was denied effective assistance of counsel at trial and at sentencing. (Pet. Mem. at 16-20.) However, many of Petitioner's specific allegations are unexhausted at the state level and thus procedurally barred. And, even considering all of the allegations on the merits, Petitioner's claim fails.

### a. Procedural Bar

First, a federal court may not grant a petition for habeas corpus if the Petitioner has not "exhausted the remedies available in the courts of the State," 28 U.S.C. § 2254(b)(1), by using the proper procedural vehicle in the state courts, *see Perez v. Conway,* No. 09-CV-5173, 2011 WL 1044607, at *3 (S.D.N.Y. Mar. 18, 2011) ("The petitioner must also have employed the proper state-law procedural vehicle so that the state courts are afforded an opportunity to review his claims"). In New York, in order to make an ineffective assistance of counsel claim, "where sufficient facts appear on the record of the proceedings underlying the judgment" to permit a direct appeal, a defendant must make his claim through direct appeal rather than a post-trial motion to vacate the judgment. *See* N.Y.C.P.L. § 440.10(2)(c); *see also Murden,* 497 F.3d at 196 (explaining that New York courts procedurally bar post-trial motions for ineffective assistance of counsel where the trial record permitted petitioner to raise the claim on direct appeal, but petitioner did not do so). However, where insufficient facts appear on the record, a defendant should make a motion to vacate the judgment under New York Criminal Procedure Law § 440.10 rather than pursue his claim through a direct appeal. *See Murden,* 497 F.3d at 196

("Since not every ineffective assistance claim is sufficiently presented in a trial record, . . . the New York Court of Appeals has long recognized that a [New York Criminal Procedure Law §] 440.10 proceeding is often superior to a direct appeal for asserting such claims."); *Perez*, 2011 WL 1044607, at *3 ("This [§ 440] rule reflects the fact that an appellate court normally cannot evaluate the substance of such a claim fairly until an evidentiary record of all the relevant facts has been made at the trial court level.  When, as here, a claim involves matters outside the trial record, like accusations about counsel's choice of trial strategies, a defendant must raise the allegations in an appropriate post-judgment motion." (internal citations omitted)); *People v. Boyd*, 664 N.Y.S.2d 335 (App. Div. 1997) ("The defendant's claim of ineffective assistance of counsel, to the extent that it is premised on his attorney's alleged failure to investigate and call potential alibi witnesses, involves matters which are dehors the record and are not properly presented on direct appeal.").

With one exception, Petitioner presented the same allegations of ineffective assistance of counsel in this Petition as he presented on direct appeal.  (Resp. Ex. 7 at R: 90-98.)  In the direct appeal, the Appellate Division held that some of Petitioner's allegations were procedurally barred, because they were based on matters outside the record and thus not properly presented on direct appeal.  *See Marquez*, 754 N.Y.S.2d at 891 ("The defendant's claim of ineffective assistance of counsel involves, in part, matters which are dehors the record and not properly presented on direct appeal.").  Here, as in the direct appeal, many of Petitioner's allegations are based on matters outside the record.  Specifically, Petitioner alleges that "[c]ounsel failed to investigate the scene, the witnesses, the inconsistencies in the witnesses' statements to the police, and their testimonies at trial," in addition to improperly waiving Petitioner's right to testify in his own defense.  (Pet. Mem. at 18.)  Petitioner's only new argument, that his trial

33

counsel "unjustifiably sacrificed [Petitioner's] constitutional and statutory rights, and along with them his defense, without informing [Petitioner] [that] pre-trial *Dunaway*, *Huntley* and *Wade* hearings were in his best interest . . . ." (Pet. Reply at 13), is also based on matters outside the record. But, because Petitioner did not use the proper procedure in state court to present these allegations (i.e. a § 440.10 proceeding), he is barred from seeking habeas relief on those claims now. *See Perez*, 2011 WL 1044607, at *3 (holding that claim was not cognizable on federal habeas review, because petitioner had failed to exhaust state remedies with appropriate post-judgment motion); *Polanco v. Ercole*, No. 06-CV-1721, 2007 WL 2192054, at *7 (S.D.N.Y. July 31, 2007) (rejecting claim where petitioner failed to exhaust state remedies by pursuing § 440.10 post-judgment motion where claim involved facts outside the record). And, Petitioner has made no arguments to justify bypassing this procedural bar.

In addition, Petitioner's new argument with respect to the pre-trial hearings is procedurally barred, (Pet. Reply at 13), because it appears nowhere in Petitioner's appeal to the state courts, (Resp. Ex. 7 at R:64). Thus, Petitioner has failed to present this claim to the state courts. *See Perez*, 2003 WL 22427759, at *7 (explaining that petitioner's claim of ineffective assistance of counsel for failure to request a *Dunaway* hearing is barred, because petitioner could have raised the issue on direct appeal); *see generally Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir. 1990) (holding "that the exhaustion requirement mandates that federal claims be presented to the highest court of the pertinent state before a federal court may consider the petition").

b. Merits

In any event, even if Petitioner had procedurally exhausted all of his allegations, those allegations, along with Petitioner's record-based allegation of ineffective assistance of counsel at sentencing, (Pet. Mem. at 19), lack merit. In order to succeed on a claim for ineffective

34

assistance of counsel, Petitioner must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "First, the defendant must show that counsel's performance was deficient, [which] requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense, [which] requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

It should be noted at the outset that "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010). To establish deficient performance, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688. There is a "wide range" of conduct that falls within the standard of reasonableness, and a "strong presumption" that counsel's performance was within this range. *Id.* at 689. To establish prejudice, the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Moreover, because this is a § 2254(d) petition, "[e]stablishing that a state court's application of *Strickland* was unreasonable . . . is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011). Accordingly, "when § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Petitioner first targets his attorney's failure "to investigate [] the scene, the witnesses, the inconsistencies in the witnesses statements to the police, and their testimonies at trial." (Pet. Mem. at 18). It is true that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. But, "conclusory allegations regarding an attorney's failure to conduct an investigation, absent a showing of what evidence an investigation would have yielded and the benefit of such evidence to a petitioner's case, are insufficient to overcome the presumption that counsel offered effective representation." *Brewer v. Lape*, No. 06-CV-10209, 2010 WL 3565176, at *28 (S.D.N.Y. June 11, 2010), *adopted by* 2010 WL 3582888 (S.D.N.Y. Sept. 13, 2010); *see also Gonzalez v. Ercole*, No. 08-CV-403, 2011 WL 5924443, at *15 (S.D.N.Y. Sept. 22, 2011) (explaining that petitioner needed to state specifically what facts would have been uncovered with more investigation to support the ineffective assistance of counsel claim), *adopted by* 2011 WL 5924431 (S.D.N.Y. Nov. 28, 2011); *Matura v. United States*, 875 F.Supp. 235, 238 (S.D.N.Y. 1995) ("Petitioner has not stated why his counsel's investigation was inadequate, what his counsel should have investigated, what this investigation would have produced, or how the fruits of this investigation would have aided petitioner's case. Petitioner has entirely failed to overcome the strong presumption that his counsel acted reasonably, and therefore, petitioner's claim is meritless."). Because Petitioner has failed to cite any specific evidence or arguments that would have resulted from further investigation, his conclusory allegation is insufficient to demonstrate ineffective assistance of counsel.

Petitioner next claims that his trial counsel was ineffective, because despite Petitioner's "ardent desire," he did not permit him to testify in his own defense. (Pet. Mem. at 18.) It is possible that an attorney's refusal to allow his client to testify could constitute deficient

36

performance by counsel under the first prong of the *Strickland* test. *See Brown v. Artuz*, 124 F.3d 73, 80 (2d Cir. 2001) ("We conclude that the decision whether a defendant should testify at trial is for the defendant to make, that trial counsel's duty of effective assistance includes the responsibility to advise the defendant concerning the exercise of this constitutional right . . . ."). Although there is no indication in the record that Petitioner was unaware of his right to testify, this Court need not decide that issue, because it is clear that Petitioner cannot fulfill *Strickland*'s second requirement that he demonstrate prejudice. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed.").

To show prejudice, Petitioner must demonstrate that it was reasonably probable that his testimony would have changed the outcome of the trail. *See Brown*, 124 F.3d at 80 (noting that even if habeas petitioner could establish that trial counsel failed to advise petitioner that it was petitioner's choice to testify at trial, petitioner still had to establish prejudice to prevail); *see also Rega v. United States*, 263 F.3d 18, 21 (2d Cir. 2001) (noting that where defendant claimed ineffective assistance of counsel in not advising him of his right to testify, defendant was required to show a "reasonable probability" that the counsel's deficiency "prejudiced the outcome"). Petitioner has provided no particulars of his would-be testimony nor has he explained how this testimony would have impacted the verdict, which alone is grounds to deny the claim. *See White v. Greene*, No. 05-CV-0545, 2010 WL 2104290, at *4 (W.D.N.Y. May 24, 2010) ("As Petitioner appears to recognize, Petitioner's failure to supply an affidavit or give any description of his proposed testimony distinguishes his case from others in which a hearing or other relief was granted." (collecting cases)). This Court surmises that if Petitioner had taken the stand at trial, he would have denied his involvement in the stabbing, testimony that would have

37

been directly contradicted by the testimony of several witnesses found credible by the jury, let alone his own post-arrest admissions. This is insufficient to demonstrate that the outcome of his trial would have been different, and thus habeas relief is not warranted. *See Rega*, 263 F.3d at 22 (finding no proof of prejudice where petitioner's proposed testimony "provided no evidence of significance that is not wholly dependent on either his credibility or on the incredibility of the witnesses against him"); *accord Halo v. United States*, No. 06-CV-5041, 2007 WL 1299158, at *4 (E.D.N.Y. Apr. 30, 2007) (dismissing ineffective assistance claim where uncorroborated testimony in the face of incriminating evidence likely would not have changed the verdict).

Petitioner also claims that "[c]ounsel further attempted to elicited [sic] incriminating evidence against [P]etitioner, indirectly, which could have been advantagist [sic] to the defense, had counsel sought to introduce the fact of petitioner's 'tatoo[s].' [sic]" (Pet. Mem. at 18.) This claim appears to be based on the fact that after the prosecution presented its case, Petitioner's counsel unsuccessfully sought to have Petitioner remove his shirt to expose his arms to the jury in order to demonstrate his tattoos and impeach the eyewitnesses for their failure to mention the tattoos when describing the man who attacked Boyed. (T2: 153-158.) Petitioner's allegation that his counsel failed to introduce the fact of his tattoos is belied by the trial transcript; Petitioner's counsel specifically sought to introduce the tattoos and "strenuously object[ed]" to the trial court's ruling preventing Petitioner from showing the jury his tattoos. (*Id.* at 156: 24-25). If instead Petitioner is taking issue with his counsel's decision not to elicit specific testimony from the eyewitnesses on the question of tattoos, "the conduct of examination and cross-examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken." *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998); *see also*

*United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987) (explaining that questions of trial strategy, including the conduct of cross-examination, "if reasonably made, will not constitute a basis for an ineffective assistance claim").

    This Court cannot say that the cross-examination decisions of Petitioner's counsel at trial were without justification. The record does not indicate the location, visibility, or significance of Petitioner's tattoos, and trial counsel may have had specific reasons not to explore the tattoos on cross-examination of the witnesses, (e.g., counsel did not know what answers the witnesses would have given), and instead attempt a dramatic final reveal of the tattoos. The Court also notes trial counsel's thorough cross-examination of the eyewitnesses, which included narrowing what Paz witnessed, (T1: 98-103), emphasizing that Mays was drinking alcohol at the time of the stabbing, (T2: 25-50), and questioning Morillo regarding the outstanding bench warrants pending when he provided statements to the police, (T2: 80-93). Given these efforts, the Court cannot conclude that trial counsel's decisions surrounding Petitioner's tattoos fell below an objective standard of reasonableness.

    Petitioner's new argument, that his counsel did not inform him that "pre-trial *Dunaway*, *Huntley* and *Wade* hearings were in his best interest . . . ," (Pet. Reply at 13), also fails. The Record shows that a *Wade* hearing was held over the course of two days, in which Petitioner's counsel cross-examined multiple witnesses and presented arguments about the suggestiveness of the photo arrays. (H; H2; Resp. Ex. 6 at R:40.) Petitioner's counsel's decision not to inform Petitioner about *Huntley* or *Dunaway* hearings likely reflects the fact that he deemed them not relevant because there was no factual dispute about the events that resulted in Petitioner's statements to police. *See Trapnell v. United States*, 725 F.2d 149, 155 (2d Cir. 1983) (observing that the "[Second Circuit has] repeatedly noted [its] reluctance to second-guess matters of trial

39

strategy simply because the chosen strategy was not successful").  Additionally, Petitioner

cannot satisfy *Strickland*'s prejudice requirement, because there is no indication that the court's

decision on these matters would have been different had his counsel sought the additional

hearings.

Finally, Petitioner alleges that his counsel failed to adequately advocate on his behalf at

sentencing. (Pet. Mem. at 19.)  Specifically, he claims that counsel "pointed out that the People

had already taken into account several items of solid mitigation in making their decision what to

prosecute," that counsel "merely recite[d] the [P]etitioner's background," and that counsel

"praise[d] the prosecution!"  (*Id.*)  However, these assertions do not constitute ineffective

assistance of counsel, particularly in the context of the entire sentencing record.  Counsel's

statement that the People also considered "the victim's background, the facts of the case, the

witness' credibility, [and] the potential problems . . . at trial," (S:7), easily could reflect a

strategic decision to emphasize the uncontested nature of these mitigating factors, and therefore

is not a basis for an ineffective assistance of counsel claim.  *See Edwards v. Greiner*, No.

03-CV-6124, 2006 WL 2355845, at *7 (E.D.N.Y. Aug. 15, 2006) (explaining that counsel's

comments at sentencing reflected a strategy and noting that it is critical in reviewing claims of

ineffective counsel to avoid confusing true ineffectiveness with mere losing tactics); *Yapor v.*

*Mazzuca*, No. 04-CV-7966, 2005 WL 894918 at *26 (S.D.N.Y. Apr. 19, 2005) (explaining that

"[d]efense counsel's comments may not have been [petitioner's] idea of an ardent plea for

leniency, but they were a reasonable strategy that did not fall below the level of constitutional

sufficiency"), *adopted by* 2005 WL 1845089 (S.D.N.Y. Aug. 3, 2005); *Perez v. Greiner,* No. 01-

CV-5522, 2002 WL 31132872, at *8 (S.D.N.Y. Sept. 25, 2002) (explaining that although

counsel's comment that if defendant committed crime "the maximum sentence is not enough,"

appears on its surface to be disadvantageous, it "may have been a reasonable and competent strategy" to avoid further alienating the judge).

Moreover, the record reveals that counsel did much more than recite Petitioner's background; he presented several mitigating arguments, including the fact that Petitioner had been cooperative with police, was only 26 years old, had no prior felony convictions or history of violent crimes, had a strong employment history as evidenced by a letter of support from a former employer, and was responsible for a young child. (S: 7-9.) Thus, it is apparent that counsel acted well within an objective standard of reasonableness. Nor can Petitioner demonstrate that he would have received a different sentence if counsel had presented different arguments. He identifies no further mitigating circumstances, and indeed, it appears that the sentencing judge focused on Petitioner's own false statement of innocence as specific grounds for the sentence. (S:13.) *See Yapor*, 2005 WL 894918 at *27 (finding that petitioner failed to demonstrate prejudice where "[i]t appears unlikely that any of [petitioner's] mitigating factors would have convinced the sentencing judge to have imposed a lighter sentence"); *see also Perez*, 2002 WL 31132872, at *8 (finding no ineffective assistance where "[i]t is unlikely that presentation of these 'mitigating' factors by his trial attorney at sentencing would have swayed the sentencing judge to impose a lighter sentence").

Therefore, after considering each of Petitioner's specific allegations, this Court finds them insufficient to demonstrate ineffective assistance of counsel and denies Plaintiff's fourth claim.

### 5. Excessive Sentence

Petitioner argues that his sentence was "harsh or excessive" in violation of the Eighth Amendment. (Pet. Mem. at 20.) It is well established that "[n]o federal constitutional issue is

41

presented where . . . the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam); *see also Rojas v. Heath*, No. 11-CV-4322, 2012 WL 5878679, at *6 (S.D.N.Y. Oct. 18, 2012) (explaining that a claim of excessive sentencing is not cognizable under federal habeas review when it is within the range permitted by New York state law), *adopted by* 2012 WL 5878752 (S.D.N.Y. Nov. 16, 2012); *Taylor v. Poole*, No. 07-CV-6318, 2009 WL 2634724, at *21 (S.D.N.Y. Aug. 27, 2009), *adopted by* 2011 WL 3809887 (S.D.N.Y. Aug. 26, 2011) (same and collecting cases).

Here, Petitioner was sentenced to 20 years imprisonment for his conviction of manslaughter in the first degree and one and a third to four years imprisonment for his conviction of criminal possession of a weapon in the third degree, the latter to run concurrently with the former. (R&R 1; Resp. Ex. 6 at R: 62.) New York Penal Law § 70.02 classifies manslaughter in the first degree as a Class B violent felony, *see* N.Y.P.L. § 70.02(1)(a), and provides that for Class B violent felonies the court impose a sentence of between five and thirty years, *id.* § 70.02(3)(a). New York Penal Law § 265.02 classifies criminal possession of a weapon in the third degree as a Class D felony, *see* N.Y.P.L. § 265.02, and provides that the maximum sentence for class D felonies is seven years, *see* N.Y.P.L. § 70.00(2). Petitioner's sentence was within the statutory range provided by New York Penal Law, and therefore, his claim that the length of his sentence amounts to a constitutional violation fails.

### III. Conclusion

For the reasons stated above, the Court finds that Petitioner's claims do not warrant habeas relief. Accordingly, it is

ORDERED that the Report and Recommendation dated March 9, 2010 is ADOPTED to the extent it is consistent with this Order. It is further

ORDERED that Petitioner's writ of habeas corpus is DISMISSED. It is further

ORDERED that because Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue, *see* 28 U.S.C. § 2253(c)(2); *Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 111-12 (2d Cir. 2000), and the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith. It is further

ORDERED that the Clerk of the Court is respectfully requested to enter a judgment in favor of Respondent and close this case.


SO ORDERED.


DATED:       February ⅃⅃ , 2013
             White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

43

Service List (by Mail):

Juan Marquez
#01-A-1882
Sing Sing Correctional Facility
354 Hunter Street
Ossining, NY 10562


John James Sergi, Esq.
Joseph M. Latino, Esq.
Westchester County District Attorney
111 Dr. Martin Luther King, Jr. Blvd.
White Plains, NY 10601


Copy To:

Hon. Lisa M. Smith
United States Magistrate Judge